the Fourth Circuit. You may be seated, thank you. Good morning, Your Honors, and may it please the Court. Martine Ciccone for Petitioners. I'd like to begin by taking a step back to address- Move the mic a little closer to you. Thank you. Is that better? That's better, thank you. I'd like to begin by taking a step back to address how we got here today because the procedural history of this case makes abundantly clear why this Court should not remand to the Board of Immigration Appeals without addressing the merits of Petitioners' claims. When Petitioners' case first came before this Court, the government sought a remand in light of Cruz v. Sessions. In that case, this Court admonished the BIA for applying an excessively narrow interpretation of facts relevant to the statutory nexus requirement that failed to account for the intertwined reasons why an asylum seeker might face persecution. Petitioners did not oppose that remand request and indeed hoped that the Board would follow this Court's guidance and reach the conclusion the record in this case compels, that Ms. Alvarez-Lagos' status as an unmarried mother was one central reason for the threats and extortion she faced at the hands of Barrio 18. But contrary to the remand request made before this Court, when this case returned to the Board, the government told the Board that Cruz had no bearing whatsoever on Petitioners' case. Accordingly, the Board did not adhere to this Court's guidance. As the government now acknowledges in that its second opinion in this case, the Board again failed to appreciate the legal import of the evidence Petitioners presented. Back in this course, asking for another remand rather than defending the Board's decision, the government continued to press its remand argument in its merits brief, going as far as to tell this Court that it could not defend the Board's decision without considering evidence the Board had overlooked. Notwithstanding that extraordinary concession in its merits briefing, just days ago, the government backtracked for a third or fourth time, telling this Court in a submission of supplemental authority that, quote, the Board's nexus reasoning in this case is consistent with past Board and judicial precedent, and the Court should uphold the Board's decision as written. Now, I walked through this lengthy procedural history to underscore the importance of this Court's review in this case. This Court has stated that those who flee persecution and seek refuge under our laws have the right to know that evidence they present of mistreatment in their homeland will be fairly considered and weighed by those who decide their fates. Petitioners were denied that right because of the Board's failure to recognize legal import of the evidence they presented, and because of the government's unwillingness or inability to maintain a consistent position regarding their claims. Without this Court's guidance, Petitioners will continue to be denied a fair opportunity to present their claims. Rather than accede to the government's remand request, this Court should address Petitioners' claims on their merits and find them entitled to relief. Turning first to the nexus requirement, the evidence in this case establishes that any reasonable adjudicator would find that Ms. Alvarez-Lagos' status as an unmarried mother living under the rule of gangs was one central reason why she, and not another person, was targeted. It's important to recognize that the record in this case is undisputed. The immigration judge has already determined that Ms. Alvarez-Lagos testified credibly, and the government made no effort to rebut the testimony of her expert witnesses. What the record evidence shows is that Ms. Alvarez-Lagos was not threatened before she became single. She lived for years with her husband and walked through the same neighborhood where she was ultimately threatened and extorted, with her husband facing no threat. Her sister-in-law, who was married and living in the same neighborhood and, in fact, in the exact same house, was never threatened by the gang. When Ms. Alvarez-Lagos was extorted by the gang member known as Chuta, he made specific reference to her gender and to her daughter, telling her, you know what we do to women, and making references to her daughter being raped and murdered in front of her. That direct evidence is corroborated by the testimony of her expert witnesses, who testified that the absence of a dominant protective male in a woman's life in these gang-infested neighborhoods of Honduras predicts violence against women. Moreover, the gang would be compelled to make a graphic public example of Ms. Alvarez-Lagos in order to show their dominance against women. And how is that distinct from the unfortunate fact of Central and South American gangs' proclivity for violence across the board if they don't get their way? Your Honor, as this Court has noted, the fact that there's widespread violence in Central America does not obviate the possibility that any one asylum seeker was persecuted on account of a protected ground. In this case, what this Court has said is if a protected status makes you a particular target, if you're more likely or if you're singled out for greater persecution on account of a protected ground, that is sufficient to meet the nexus requirement. That's exactly what we have here. And I'm not suggesting that it's a simple issue of is based on the gang's desire to dominate the population as part of their political strategy in a sense. So it's not just that her status makes her vulnerable and it's certainly not just that everybody is susceptible to gang violence. Ms. Alvarez-Lagos was specifically targeted because she was a single mother, both in order to exploit her vulnerability and to demonstrate the gang's dominance over women in particular. Of course, one of the issues in this case is that the IJ and I guess the BIA as well assumed the existence of a protected social group or a legitimate social group for purposes of the claim. That has never been litigated, correct? Not exactly, Your Honor. In fact, the immigration judge found that the particular social group was not cognizable. And in its first opinion, the board adopted and affirmed that decision. So for that reason, the issue of whether her particular social group is cognizable is before this court. The government does not offer any defense of the immigration judge's analysis on that score. And in fact, the first time this case came before the court, the government expressly conceded that it could not defend the immigration judge's decision on a particular social group because it was legally erroneous. So while the issue is before the court, and I believe this court can and should reverse the immigration judge's opinion because her particular social group is immutable, particular, and socially distinct, I do not believe that this court can affirm on the ground that her particular social group is not cognizable because the immigration judge's analysis on that score is conceitedly erroneous. And is there evidence in the record to support that legal conclusion you just came to, that the group meets all the characteristics of a legitimate social group for purposes of an asylum claim? Yes, Your Honor, there is. And we discussed it in our opening brief. On the issue of immutability, she's a woman, she's a parent, and she's unmarried. And I don't think there's any doubt that those characteristics are immutable such that one should not be required to change them. With respect to particularity, the immigration judge's error, in addition to erroneously finding that the group is defined by persecution, which it isn't, the immigration judge's error with respect to particularity was determining that the group was too large. That's not the meaning of particularity. The question is whether there are specific benchmarks that one can determine who is in and who is out. Whether one is married or unmarried, there's a very clear line delineating that. Whether one is a parent, there's a very clear line delineating that. And as the record shows, whether one is living under the rule of gangs or living under the rule of civilian authorities is also quite clear in Honduras, and that's a testimony for expert witnesses. So with respect to particularity, the standards met. With respect to social distinction, what this Court has said is that... But whether or not someone's living under the rule of gangs, again, that gets back to the point of just how prevalent these gangs are, right? So couldn't the argument be that virtually everyone is living under the rule of gangs? I don't think it's true that every square inch of Honduras is under the rule of gangs such that civilian authorities have no power, as they do in this neighborhood. I'm not an expert on that, but even if that were the case, it doesn't change the fact that you know who is and who isn't. It just means that everyone is. But again, the question of breadth is not... The group need not be small in order to be particular. It can be large as long as it's clearly defined. And even taking Your Honor's point that everyone lives under the rule of gangs in Honduras, not everyone is unmarried, and not everyone is unmarried with a child. Moving to social distinction, the I.J.'s error on that point was, again, in addition to misinterpreting her social group to find it defined by persecution, the I.J. erroneously suggested that past experience cannot define a social group. The government concedes in this as at page 90 of the AR that that was also legal error. The group is socially distinct, and this goes back to this Court's decision in Temu, where a group is targeted for more severe persecution is evidence of respect to the nexus test. That standard is met here as well. Can I ask you a question? And I totally understand the reluctance around an additional remand. But when it comes to this particular social group holding, I actually read the board review slightly differently. I thought the board was not really passing on this and relying exclusively on the nexus point. And if that's true, the ordinary remand rule would certainly suggest that, and particularly on what counts as a particular social group, that's a tricky, complicated thing, and you'd want the agency to go first on that. I mean, isn't that something on which, putting to one side nexus, isn't that something on which a remand seems pretty appropriate? Your Honor, I do think, again, I do think that this Court has the authority to decide it based on the fact that the board adopted and affirmed, and that's clear in the first board opinion at page 145, which puts both decisions before this Court. I agree with you that the second decision is a little less clear, and in fact, I think it's a mischaracterization of the first decision where the board says we didn't decide that. In fact, they did by adopting and affirming. Again, because the standard is clear, I would ask this Court to decide. I think that the question of legal cognizability based on particularity and social distinction is quite clear. If this Court felt it was appropriate to remand, I certainly agree with you that it is less defined in the record, less addressed in the record than the issue of nexus, which has been repeatedly analyzed by the board. I wonder, is there anything, because I thought your recitation of the procedural history of this case was compelling, and I am concerned that the government, I guess, opposed a stay motion recently. If we felt compelled to remand under the ordinary remand rule, could we do something like maintain jurisdiction over the appeal and issue a stay in eight-of-hour jurisdiction just to make sure that things sort of stay frozen while we let the agency take a one, two, three, fourth chance at this case? You're talking about a stay of removal even if the board doesn't deny her claim again? I'm not aware of any reason why this Court could not do that. I would just suggest that in repeated decisions where the board has misapplied the nexus standard, this Court has evaluated the evidence on the record where it is unchallenged and undisputed and has come to the conclusion that no reasonable adjudicator could find anything but. I'm putting to one side the nexus issue for a minute, but if we felt compelled to remand on the particular social group question, I'm just wondering if there's a way to both sort of follow our normal ordinary remand rule on that issue and at the same time not open the door to some of the things that you are concerned about. Yes, Your Honor. Again, I'm not aware of any reason why this Court could not maintain jurisdiction such that the government be foreclosed from opposing her right to stay in this country pending this Court's final review. And you are correct. The first time the board denied her claim and she came to this Court and sought a stay, the government did not oppose it. The second time, the government did oppose the stay and then, of course, turned around and said it could no longer defend the board's decision. So I think it's very telling that having, as the board, if the government had its way, petitioners would be in Honduras right now, notwithstanding the fact that the government cannot defend the decision that would have put them there. If there are no further questions, I'll reserve the balance of my time. Thank you, Counsel. Good morning. May it please the Court, Paul Fiorino for the Attorney General. Judge Harris, to answer your question, if the Court should remand again, is there an avenue for the alien, for Ms. Alvarez-Lagos to remain, and the government wouldn't oppose a stay of removal if the Court were to remand again? To address the procedural history of this case, we maintain that the Court can and should affirm the board's decision in this case as it's written, based on the fact of nexus. The board found that there was no persecutory motive when the petitioner was approached by CHUTA. I'm sorry, am I misremembering? I thought your brief said it couldn't be defended because the board didn't look at either the gender-based nature of the threats against her or the expert testimony that as an unmarried mother, she would be at a much higher risk. Isn't that what your brief says? Well, we felt that the board needed to address specific evidence of the expert witnesses in order to determine whether or not a mixed motive analysis was necessary. And we were disappointed that the board didn't go as far as we would have liked to discuss whether a mixed motive analysis was necessary. However, what the board decided in this case is that a mixed motive analysis was not necessary because the sole motivation for CHUTA when he approached Ms. Alvarez-Lagos was to obtain money. And that was his consistent motive throughout. The mere fact that she happened to be a single mother was not part of his decision. But how can that be in the face of the testimony, the summary of the statements by CHUTA regarding her status as a woman and what gangs do to women? Well, if you take a look at what happened, the first time CHUTA approached Ms. Alvarez-Lagos, he asked her for money. He said, how's your daughter? Give me 2,000 lempiras. She went back and got the money. Then he came back and asked for 10,000 lempiras, and she balked at that, and then he threatened her. The fact that she is a single mother and that he knew about it was not a motive. It was a tool. His motive was to get money, as you recognize the motive of the gangs in Central America is to get money. It would be as if— Where's the evidence of that in the record? You didn't even oppose the expert, did you? I don't believe that the government did, no. Well, what do you—I'm not all due respect to you. That whole cloth which you're arguing for us now, where in the record is that? You said, well, that's really the primary— You can only talk about what the record is, right? There's evidence in the record. There's her testimony, which is unrefuted, and then there's the expert testimony of the expert— Unrefuted? Unrefuted, but the expert who wasn't there. That doesn't matter. It's unrefuted. That's why they give opinions. They're not fact witnesses. That's why they're experts. Well, exactly. That doesn't help you. They make conclusions about—it's even more powerful than fact witnesses. Well, they're doing what you're trying to do, tell us what all this meant. He said that, you know we do to women. We'll rape your daughter right in front of you and kill her. Well, those were just tools to get the money. Let me give you an— Tools? Yes. You think?  Would that tool be used for a man? Yes. Let me explain, Your Honor, if I may. Go ahead. Okay, I'm a gang member, and I want to extort somebody. Right. Give me your money, or I'll burn your house down. Now, does that mean that I am persecuting you on account of being a homeowner? No. I'm using your house as a tool to get the money that I want. The evidence in the record is that the gang extorts everybody, not just single moms, but taxi drivers and businesses. Money was first, last, and the only thing that you wanted. The evidence in the record is also that women are, in particular, even more vulnerable than the general population because of their status as, in this case, as unmarried mothers. That's what she testified to. That's what the experts suggested. So, how did the board deal with that evidence? Well, the board notes that, yes, that women are more vulnerable, but what's going on here, they're more vulnerable to extortion. What's going on here is extortion. The board says, yes, we understand. The expert says women are more vulnerable, but what they're really more vulnerable to is extortion. Where do I find that in the board's decision? What I meant to say, Your Honor, is that the board recognized in its first and its second decision that the primary motivation of the gang was to get money. In your own brief, I'm just so confused, your own brief says it would be improper to defend in discussing all of this argument, says we can't rely on it under Chenery because the board didn't rely on it, so we have to remand this case to the board so that the board can of this brief and your argument today? Well, Your Honor, the court denied our motion to remand, and it's our position, as it has been since the beginning, that the result and the outcome in this case is correct. So, with the understanding that we may run afoul of Chenery in making these arguments, our position is that this decision is correct, and a reason I agree that these arguments are inconsistent with Chenery. I mean, you agreed with it in your brief, so I assume you still agree with it. Yes. But, as this court recently recognized in the Cortez-Mendez case, that the existence of a protected ground and its role in a threat or an extortion isn't necessarily compelling evidence that that protected ground was the reason that the threat was made, as we lay that out on our 20HA. So, the court's jurisprudence does recognize that the mere presence of a protected ground is compelling evidence of a persecutory motive. We'd ask the court to especially look at the concurring opinion in Velazquez, which is a nice summation of where we think this case fits into all the other courts' jurisprudence. The concurrence in Velazquez says that the particular social group jurisprudence and the use of, as I interpret it, the particular social group jurisprudence and the use of asylum is a tool for obtaining protection from crime is getting overbroad. And I think that, as I recall, the concurring opinion says that the PSG concept is losing its rigor. But, again, we don't think the court even needs to get to PSG here. The board has been very clear from the beginning that this case is about street crime in a very violent part of the country. And to try to use a social group or even a political opinion is not what the asylum laws were meant to protect against. I'm sorry. On the particular social group, you are not arguing that we could affirm on the basis of what the IJ said about that, right? Correct. Because everything the IJ said was wrong, more or less, right? I don't know if everything, but we... Pretty much everything. It's an unusual case because there were multiple rationales and they were all wrong. Well, in our first brief, we didn't defend PSG, right? But, like I said, the court doesn't have to get there. Based on both boards' decisions, you only get to PSG cognizability if you find that there was a persecutory nexus and that the persecutory nexus was membership in a PSG. Well, we don't have to get there here. This is just common, basic street crime extortion, the kind that afflicts large swaths of Honduras and all of Central America, in fact. And to hold that Ms. Alvarez-Lagos warrants a merit of asylum in this case would necessarily mean that virtually every single mother in Honduras would likewise be worthy of asylum. We're not blind to the notion that the violence and the conditions in Honduras are horrible. We know that. But our duty is to apply the law for its intended purpose. And we think that the board's decision here, when it looked at the evidence before it, it concluded that there was no... That the fact that Ms. Alvarez-Lagos was a single mom was not a motive, but it was a means to the end. In the end, at the beginning, the middle, and at the termination of the encounter was one thing, and that was money, which is common in Central America. Can I ask you a question about the torture, the cap relief claim? Yes, ma'am. What's the evidence supporting the IJ's finding that she, the petitioner, hasn't shown a sufficient likelihood of mistreatment? Because all the IJ says about this, I mean, the IJ announces the standard. You can't just string together a lot of speculation. But there's no discussion of the evidence. And there is her, right, her credited testimony that they threatened to kill her. There's the evidence that they're looking for her now. And then there's the expert testimony that, of course, they're looking for her now. And if she goes back, they'll kill her. So what is the substantial evidence that supports the finding that there is not a likelihood of torture? That's a difficult question to answer, Your Honor. I can see the court's reservation about that. However, another part of the equation for cat protection is acquiescence. So on acquiescence, is it your position that either the IJ or the BIA considered the expert testimony on the links between the police and the gang or petitioner's own testimony regarding police collaboration with the gang in her own neighborhood? Yes, that's our position. That that was considered by the BIA? Well, it was considered by the IJ as affirmed by the BIA. Okay? Because you know, and I don't know exactly the page, but in the IJ's decision early on, he says that we have considered every piece of evidence, whether we mention it or not. The only thing that the IJ actually discusses is sort of general country conditions, right? There's nothing about either the expert testimony or her evidence about her neighborhood. Well, as I recall, the IJ spent a couple pages about, as I recall, on Dr. Borman and Dr. Manwaring. In connection with the torture claim? I think just in general. The torture analysis is pretty quick, and it's just that we've considered the general country conditions. There's widespread violence. The Honduran government is unable to contain the problem, and that generalized reporting doesn't establish the case, period. Well, one of the aspects of the board's decision was also that she hadn't shown acquiescence. I'm sorry, I was just quoting you what the IJ said about acquiescence. Are you saying that the board provided, the board actually addressed the evidence? I thought you said the board only adopted the IJ on this. I don't mean to run you around. It doesn't look to me like anyone has actually addressed the evidence of acquiescence in this case. I believe that it was either the IJ or in the first board decision where they mentioned that she had failed to make a police report and had failed to show that the police would actually acquiesce in her torture. And her argument is, I didn't make a police report because I was told that if I reported it to the police, the gangs would find out right away. So that's actually her affirmative evidence of acquiescence. Well, in this case, the board and the IJ found that she still hadn't met her burden. Another aspect of acquiescence, though, is the country conditions evidence that the board and the IJ cited, which indicates that throughout Honduras, the government is taking steps to combat gang violence. And the mere fact that the government isn't always successful does not mean that the government does, in fact, or would, in fact, acquiesce in torture in this case, as the court recognized in the Suarez-Valenzuela case. The fact that the government may, in some cases, be ineffective, may be unable to completely eradicate gang violence does not equate to assuring that the government would acquiesce in torture. And so it's a distinct concept from unable or unwilling. And in that respect, I must say that on page 38 of our brief, we cite the Crespin-Valadares case, which does mention unable or unwilling, and that is not correct. The standard for torture is acquiescence, and unable or unwilling are concepts that are applicable to asylum and withholding. Is it a concept that is countrywide, or can a petitioner make out a claim unique to her particular environment? In other words, Cindy suggests that in her neighborhood, the gangs are effectively in charge and there's no government, per se. What about that? She would have to show that a government official would breach their duty, turn a blind eye to protecting her against torture. Without going to the police, and in the presence of a national effort to fight gangs, she hasn't met that burden yet. You're saying that if a petitioner's entire claim is that, in my neighborhood, the police are working hand-in-glove with the gangs, she can't succeed unless she's prepared to go to the police with her complaint first? Have we ever said that? That's not what I'm saying. I'm just saying that the facts of this case is not that the police are working hand-in-glove with the gangs. But that's her, she's got testimony to that effect, right? And she has the, I mean, it sounds, I'm glad if this is not the government, the government's position is not that you must always report to the police as part of a claim that the police will kill you if you No, that's not our claim that you must always, but given the fact that she didn't in this case, and given the country conditions evidence, we say that there's no compelling evidence that she's met her burden. Right, and I feel like maybe the agency would come out that way, but I'm missing the part where the agency considered her evidence. This is just so frustrating because it's been four years, right? It is frustrating, Your Honor, and I'm not going to deny the fact that it's been frustrating for us. We amended the first time, we wanted the board to squarely confront this evidence, but never along the way have we ever deviated from our position that the result is proper in this case. This case is common street crime, and it's the type of misery that inflicts, it's inflicted upon everybody in Central America. It's not the type of harm that asylum and we just wanted to get the board to just come out and talk about Dr. Borman and Dr. Manwaring. I'm sorry, I didn't talk about him because I thought he was boring. I know, but you know, to get them just a couple sentences to say, this is why this is not a mixed motive case. This is why this is not, and this case is not a mixed motive case. That's our position. Unfortunately, we didn't get that, and so we're in the position now of having to defend the outcome, which- I mean, I would be very interested in your opinion. Is there any chance you'll get it on remand? What's going on here? Do you have some level of confidence that if we send this back on remand, the board will finally look at the evidence? If the court were to say, the board is, remanded the board to specifically address whether or not a mixed motive exists in the light of the expert testimony of Dr. Borman and Dr. Manwaring, that would be something that the board hasn't been able to do. We haven't heard from yet. Both of our remand motions, I think were, well, I think our second remand motion actually said that, but it was our motion and not the court's order. So again, just to sum up, I'm running out of time here. This has been a frustrating case from the beginning. Our position is now and has always been that the outcome is correct. This case can be defended on the basis that the board gave, that there's no persecutory motive here, that there's no nexus between Chuda's desire for money and Ms. Alvarez-Lagos's status either as a single mom or her political opinion. And that in the presence of a nationwide effort to eradicate gangs, though unsuccessful, and in the absence of her actually attempting to get the help of the police, she hasn't met her burden to show that the government would acquiesce in any torture on her part. I really thank the court's patience with the government throughout this. And unless the court has any further questions. The case was remanded. You agree that it stands on this record alone, no additional evidence I believe that this record contains all the evidence that there could possibly be to resolve this case. In other words, we have her testimony, which was fresh, because I think it was two years after the events happened. We have the expert testimony of the witnesses. The only thing that might change it, Your Honor, would be more recent country conditions evidence. The reason I say that is because I don't think that the immigration judge or the board ever made a finding as to whether she has a well-founded fear of future persecution. In other words, a prospective fear of future persecution. I don't think the board ever made that. I think that the Petitioner's Council actually recognized that as well. To the extent that a finding would have to be made in that, the trial court immigration judge would probably want more current evidence. I don't know that it would be any different. The evidence is enough for us now as to decide whether or not there was a nexus, correct? Correct. Based on the past events, yes. Unless there's any further questions from the court, thank you again. Thank you, Counsel. Thank you, Your Honors. I'd like to start with the CAT issue. As my colleague admitted, there is no defense of the IJA's determination that she is not more likely than not to face torture. She was specifically threatened with rape, murder, and the abduction of her child. And there is no defense on that score. With respect to acquiescence, the evidence is clear. One thing I will point out, my colleague suggested that the agency had found that the Honduran government is making efforts to address the problem of gangs. He did not give you a site because there is none that is not in the record. That is a post hoc rationale that is not found in this record. What the IJA did find is that evidence that a government, excuse me, that on page 262 of the record, what the record does show is that the IJA found that the Honduran government is ineffective at combating gangs. What the evidence also shows with respect to acquiescence is that Ms. Alvarez Lagos testified that areas of her neighborhood were essentially no-go zones because of the gangs, and that she believes that the gangs and the police worked together because when there would be shootings in her neighborhood, the police would not come until after everyone was dead. She was told by her persecutor that if she did not comply, if she went to the police, he would kill her faster. All of this direct evidence was corroborated by her expert witnesses who testified that essentially Honduras is a criminalized state and that all of the evidence of acquiescence she personally experienced were consistent with their understanding of country conditions. You can find that at AR 394 through 396. And I want to be clear, this is not a case in which every single mother in Honduras will be entitled to asylum or cat protection if you reverse the board. This is a case about specific evidence of threats, the specific experience of one woman and her child who were threatened with horrible crimes based on their status, specifically Ms. Alvarez Lagos' status. She testified credibly. She had declarations from her sister-in-law who testified that there was no threats to her even though they were living in the exact same house because she was married. Her experts testified that all of her personal experiences were consistent with what they understood to be the conditions in Honduras. This is not a case about country conditions. This is a case about the experience of one woman and her young daughter. And I would point out also there's been a lot of discussion about what the board will and won't do on remand. And while I respect my colleague's statements that DOJ wants the board to do what he has suggested with respect to mixed motive, that has not been the case. And I think part of the problem may be that whatever the Department of Justice can say, the Department of Homeland Security takes a different view. That's the experience we had when this case went back before the board on remand after Cruz. The Department of Justice represented that the board should reconsider its opinion in light of Cruz and the Department of Homeland Security took the position that Cruz had no impact whatsoever on this case. So I think whatever frustration Mr. Fiorino is experiencing, we can certainly sympathize with that because we are equally frustrated. I am also surprised that Mr. Fiorino is asking this court to affirm the board's decision. I think it is apparent from his statements that that is not consistent with either his chain re-obligations or the obligation of this court to only affirm on the basis of the agency's decision. The agency in no way found that this is a single motive case. The agency has always assessed this as a mixed motive case, as is apparent by its citations to Quinteros-Mendoza, which is a mixed motive case. And again, there would have been no reason to remand in light of Cruz if this was not a mixed motive case. Whether the agency takes the view or not that there is a single motive ultimately doesn't change the fact that that would be wrong. Ms. Alvarez-Lagos testified credibly and presented other credible evidence that her status as an unmarried mother was one central reason for her persecution. So the Department of Justice may take the view that this is not a mixed motive case, but in fact it is. And she has established that her protected status was one central reason. I would conclude by asking this court if you are inclined to remand for the PSG determination, I would ask this court to reach the CAT determination because if Ms. Alvarez-Lagos and her daughter are legal basis, but if this court does remand on any aspect of the asylum decision, I would ask that you reach the CAT issue and find that she is entitled to relief under CAT as well. If there are no further questions. But with respect to that, I guess what you're saying is we would not remand for further determination of the CAT claim, but would decide the claim on the present record? I think there is ample evidence in the record to find that the board, if I may continue, I think there is ample evidence in the record to find that the agency's determination that she is not entitled to CAT relief is not supported by substantial evidence and the record shows that she is entitled to relief under CAT and this court can find that. And that's even if, as has been indicated, the IJ apparently applied the wrong test? I don't, under CAT, I think the IJ misapplied the test, but it is a two-pronged test. Why the test just misconstrued the facts, I guess is your point. Absolutely. The record speaks for itself. The record is clear and Ms. Alvarez-Lagos and her daughter are entitled to relief under CAT. Thank you, counsel. We'll come down to greet counsel and proceed to our last case for the morning.
judges: Roger L. Gregory, Albert Diaz, Pamela A. Harris